## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GERALD MINNITI,

              Plaintiff,

    v.

CRYSTAL WINDOW & DOOR
SYSTEMS PA, LLC, *et al.*,

              Defendants.

No. 4:21-CV-01788

(Chief Judge Brann)

## MEMORANDUM OPINION

### NOVEMBER 16, 2023

Gerald Minniti was formerly employed by Crystal Window & Door Systems PA, LLC[1] ("Crystal") as a plant manager in charge of Crystal's Benton, Pennsylvania plant (the "Plant"). Minniti was hired to turn around the Plant, which had been unprofitable for some time. However, Minniti's employment was terminated after less than a year, and within one week of Minniti having refused to fire two African American employees who did not report to work due to medical issues. Although there is good reason to doubt Crystal's proffered reasons for Minniti's termination—poor performance and financial concerns—Minniti has not produced sufficient evidence that he engaged in protected activity, and the Court will therefore grant summary judgment in Crystal's favor.

---

[1] The complaint lists two separate entities as defendants, and it is not clear precisely which was Minniti's employer. For the sake of clarity, both entities will be referred to collectively as Crystal.

## I.     BACKGROUND

In 2021, Minniti filed this complaint against Crystal, alleging that it had fired Minniti in retaliation for opposing racial discrimination, and in retaliation for protecting employees' rights under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq* ("FMLA").[2] Minniti raises four counts: retaliation under the FMLA; retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq* ("Title VII"); retaliation in violation of 42 U.S.C. § 1981; and retaliation in violation of the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, *et seq* ("PHRA").[3] Crystal filed an answer to the complaint, and the matter proceeded through discovery.[4]

Crystal has now filed a motion for summary judgment, arguing that it is entitled to judgment in its favor as to all counts.[5] Crystal first argues that judgment in its favor is appropriate as to Minniti's § 1981, Title VII, and PHRA claims because Minniti cannot establish a *prima facie* case of retaliation, as he did not engage in protected activity and there was no causal connection between any alleged protected activity and his firing.[6] And even if Minniti could establish a *prima facie* case, Crystal asserts that there were legitimate, non-retaliatory reasons for Minniti's firing—his poor performance and Crystal's financial problems—and he cannot

---

[2]    Doc. 1.
[3]    *Id.* at 6-9.
[4]    Doc. 7.
[5]    Doc. 26.
[6]    *Id.* at 11-19.

demonstrate pretext.[7] Second, Crystal contends that Minniti cannot establish any underlying § 1981 violation, since no evidence demonstrates racial discrimination.[8] Finally, Crystal asserts that Minniti's FMLA claim fails since neither he nor the two employees whom he claims to have protected requested FMLA leave or were discouraged from requesting FMLA leave.[9]

Minniti responds that he engaged in protected activity when he refused to fire two African American employees who had not reported to work due to medical issues; Minniti informed his supervisor that such a firing would look bad and expose Crystal to legal liability.[10] Minniti also argues that there is a causal connection between that activity and his firing, as the activity occurred only one week before he was fired, and he had reported after the meeting that he believed his supervisor was threatening his job for refusing to fire the employees.[11] Minniti further asserts that Crystal's proffered reason for his firing is pretextual, as demonstrated by the fact that he was never warned of any performance issues, Crystal expected the task of turning the Plant around to take years, not months, and a new plant manager was hired three months after Minniti's termination, a floor manager was hired, and others were given raises, belying any claims of financial motives for firing Minniti.[12]

---

[7]   *Id.* at 19-23.
[8]   *Id.* at 23-24.
[9]   *Id.* at 24-26.
[10]  Doc. 30-1 at 6-10.
[11]  *Id.* at 10-12.
[12]  *Id.* at 12-15.

Crystal has filed a reply brief, rendering this matter is ripe for disposition.[13]

For the following reasons, the motion for summary judgment will be granted.

## II.    DISCUSSION

### A.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[15] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[16] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[17]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[18] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth

---

[13]    Doc. 31.
[14]    Fed. R. Civ. P. 56(a).
[15]    *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
[16]    *Clark*, 9 F.3d at 326.
[17]    *Id*.
[18]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[19] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[20] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[21]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[22] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[23] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for purposes of the motion."[24] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[25]

---

[19]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[20]   *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[21]   *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (internal quotation marks omitted).

[22]   *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[23]   *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[24]   Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[25]   Fed. R. Civ. P. 56(c)(3).

**B.      Undisputed Facts**

In September 2019, Minniti was hired as the plant manager for the Plant.[26] Prior to accepting that position, Crystal informed Minniti that the Plant was not performing well, and that part of his position would involve improving its financial performance.[27] As the plant manager, Minniti reported directly to Crystal's Chief Operating Officer, Andy Shashlo.[28] Shashlo oversaw the operations of all of Crystal's plants and, despite working in New York City, Shashlo visited the Plant at least once per week.[29] Minniti believed that turning around a struggling plant was "not an overnight thing;" rather, making the Plant profitable would take some time, and he informed Crystal of this.[30]

By January 2020, the Plant was continuing to struggle financially, and Minniti and Shashlo began having conversations about the financial performance of the Plant and progress in fixing the issues that plagued it.[31] Between January and March 2020, the Plant lost approximately $327,000.[32] Unfortunately, around that time COVID-19 began quickly spreading throughout the country and, in March 2020, the Plant shut down for three days due to a COVID "scare."[33] This shutdown resulted from a

---

[26] Doc. 27 ¶ 32.
[27] *Id.* ¶¶ 13-15, 29-31.
[28] *Id.* ¶¶ 8, 33.
[29] *Id.* ¶¶ 10, 34.
[30] Doc. 28-3 at 10, 12.
[31] Doc. 28-3 at 12-13; Doc. 28-4 at 22.
[32] Doc. 27 ¶ 75.
[33] Doc. 27 ¶¶ 40-45; Doc. 30-2 ¶¶ 40-45.

mass employee walkout after one employee on the plant floor was rumored to have tested positive for COVID.[34]

With COVID-19 continuing to proliferate throughout the country—and Crystal experiencing resulting financial issues—most of Crystal's employees, including Minniti, were furloughed from March or April 2020 until May 2020.[35] During the period of furlough, Shashlo continued to work daily, and Minniti would occasionally work at the Plant while also participating in daily calls to discuss attendance and production at the Plant.[36] Minniti's furlough ended in late May, and he thereafter returned to work at the Plant fulltime.[37]

In June 2020, with Crystal still experiencing financial difficulties, the company implemented a salary reduction of twenty percent for all senior members of Crystal, including Shashlo and Minniti, although Minniti's salary was reduced by only ten percent, at his request.[38]

On June 10, 2020, Shashlo emailed Minniti with a list of concerns regarding the Plant's operations and financial progress, as the Plant was still losing approximately $100,000 per month.[39] Specifically, Shashlo noted that he was concerned with: (1) a "lack of communication and coordination between

---

[34] Doc. 27 ¶¶ 40-45; Doc. 30-2 ¶¶ 40-45.
[35] Doc. 27 ¶ 64.
[36] *Id.* ¶¶ 65-67, 93.
[37] *Id.* ¶ 68.
[38] *Id.* ¶¶ 69-70, 73.
[39] Doc. 28-3 at 109.

management" which resulted in lost production; (2) a failure to "understand the schedule of build days in advance"; (3) Minniti's failure to be present in the Plant on days when individuals were scheduled to work overtime, which Shashlo felt "sets a poor example"; (4) scheduling too many employees to work at any given time; (5) failing to include supervisors in the hiring process; (6) failing to ensure proper housekeeping of the Plant; and (7) failing to enforce the use of personal protective equipment.[40] Shashlo stated that those issues needed to be addressed immediately.[41]

The following day, Minniti responded "to each bullet point telling [Shashlo] what [Minniti would] do to fix any concerns" that had been presented.[42] Nevertheless, Minniti thought that Shashlo's complaints of financial losses were "funny" given that "[j]ob sites were shut down . . . everywhere. You could not ship a window anywhere because there was no one on site to take them or install them" and, as a result, no windows were being sold and the Plant "had windows on every square inch of that building because we could not ship."[43] As Minniti explained, it was natural that the Plant was then losing money because "all I was doing was having production costs, material costs, the financials to—payroll costs without being able to ship anything out" to generate profit.[44]

---

[40] *Id.*
[41] *Id.*
[42] *Id.* at 22.
[43] *Id.*
[44] *Id.*

During this time, it also appears that the relationship between Minniti and Shashlo steadily deteriorated. In March 2020, Minniti contacted Steven Chen, Crystal's President, to notify him that Shashlo was verbally abusive toward Minniti and the rest of the Plant staff.[45] In May 2020, Minniti complained to Crystal's human resources manager Isabella Leung that Shashlo continued to be verbally abusive to all Crystal employees, including Minniti.[46]

Into June 2020, both Shashlo and Minniti participated in daily calls and, when Shashlo would visit the Plant once per week, he, Minniti, and other plant leaders would participate in the daily call from the same room.[47] As part of that phone call, the participants would discuss absences and attendance problems.[48] This was important because, when employees missed their scheduled shifts, it often hurt the Plant's productivity.[49] Attendance had been a significant problem at the Plant, and Minniti was attempting to deal with that problem, resulting in Crystal regularly firing employees who had attendance issues.[50]

On June 16, 2020—a day that Shashlo was present at the Plant—two Crystal employees (the "Employees") were absent from their scheduled work shifts.[51]

---

[45] Doc. 27 ¶¶ 86-89; Doc. 30-2 ¶¶ 86-89.

[46] Doc. 27 ¶ 91; Doc. 30-2 ¶ 91.

[47] Doc. 27 ¶¶ 93-96.

[48] *Id.* ¶¶ 97-98.

[49] *Id.* ¶ 99.

[50] *Id.* ¶¶ 100-01.

[51] Doc. 27 ¶ 103; Doc. 30-2 ¶ 103; Doc. 28-3 at 25-26. Although Minniti denies that the Employees were expected to be at work but were absent, in his deposition he agreed that the Employees "were expected to be there on June 16th, but they weren't there." Doc. 28-3 at 26.

During the daily call, Shashlo discussed the absence of the Employees and insisted that they should be fired based upon their absence.[52] Shashlo was informed that both employees had called in to notify Crystal of their absences for medical-related reasons but, nevertheless, Shashlo insisted that the Employees be fired.[53] Minniti "explained" that the Employees were some of the only African American employees who worked at the Plant and, consequently, it would "look bad" to fire them, open Crystal up to a lawsuit, and firing them generally "wasn't going to work."[54] Three days later those employees provided doctor's notes that excused them from work, and their absences were counted as excused absences.[55] The Employees never requested leave pursuant to the FMLA.[56]

On June 17, 2020, Minniti met with human resources employee Amanda Cardillo to report concerns with Shashlo's request to fire the Employees.[57] Although not documented in Cardillo's notes of the meeting, Minniti states that he informed Cardillo that he felt his job was being threatened over the refusal to fire the Employees.[58] That same day, logistics manager Lester Hong sent an email to Minniti, Shashlo, and several other individuals that detailed the Plant's outstanding

---

[52] Doc. 27 ¶¶ 104-05; Doc. 30-2 ¶¶ 104-05.
[53] Doc. 28-3 at 26.
[54] *Id.*
[55] Doc. 27 ¶ 110.
[56] *Id.* ¶ 111.
[57] *Id.* ¶¶ 113-16.
[58] Doc. 28-3 at 26-27.

backorders for the aluminum line.[59] Shashlo responded to this email, informing Minniti that "this has become unmanageable and is impacting our cash flow and [the Plant's] profitability" and needed to be better tracked and managed by Minniti and his team.[60]

On June 23, 2020, Minniti's employment with Crystal was terminated.[61] In the letter provided to Minniti detailing his termination, the only reason provided for his firing was the financial impact of COVID-19 on Crystal's operations and its need to "ensure the financial stability of the company."[62] Nevertheless, three months later, Crystal filled the vacancy created by Minniti's firing[63] and, days after Minniti was fired, Crystal hired a new production manager for the Plant and two other managerial-level employees were given salary increases.[64]

### C.   Analysis

#### 1.   Title VII, § 1981, and PHRA Retaliation Claims

The Court first addresses Crystal's argument that Minniti's Title VII, § 1981, and PHRA retaliation claims fail. Crystal contends that Minniti cannot establish a *prima facie* case of retaliation, as there is no evidence that he engaged in protected activity, nor any evidence of a causal connection between Minniti's activities and

---

[59]   *Id.* at 111.
[60]   *Id.*
[61]   Doc. 27 ¶ 79.
[62]   *Id.* ¶ 80. Doc. 28-3 at 112.
[63]   *Id.* ¶ 81.
[64]   Doc. 28-3 at 31.

his termination.[65] Even if Minniti could establish a *prima facie* case of retaliation, Crystal asserts that he was nevertheless fired for legitimate, non-retaliatory reasons—namely, Crystal's financial difficulties and Minniti's failure to make the Plant consistently profitable.[66] Finally, Crystal argues that Minniti cannot demonstrate that the reasons for his firing are merely pretextual.[67]

Title VII, the PHRA, and § 1981 all prohibit, *inter alia*, discrimination in employment on the basis of an employee's race, and make it unlawful for an employer to retaliate against an employee for opposing such discrimination.[68] With limited exceptions not applicable here, discrimination claims under all three statutes are analyzed using the same standard.[69]

In cases where, as here, there is no direct evidence of retaliation based on the opposition to racially discriminatory practices, the Court must use "the burden-shifting framework that the Supreme Court announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)."[70]

> Under the *McDonnell Douglas* framework, a plaintiff asserting a retaliation claim first must establish a *prima facie* case by showing (1) that she engaged in protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's

---

[65] Doc. 29 at 12-19; Doc. 31 at 8-20.
[66] Doc. 29 at 19-21.
[67] *Id.* at 22-23.
[68] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015); *Est. of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 797-98 (3d Cir. 2010).
[69] *Daniels*, 776 F.3d at 192-93; *Est. of Oliva*, 604 F.3d at 798 n.14.
[70] *Daniels*, 776 F.3d at 193.

protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.[71]

If "the plaintiff makes these showings, the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action."[72] "If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."[73] "Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times."[74]

While there are significant reasons to question whether Crystal's proffered legitimate, non-retaliatory reasons for terminating Minniti's employment are merely pretextual,[75] the Court need not reach that part of the *McDonnell Douglas* test, as the

---

[71] *Id.* (brackets and internal quotation marks omitted).

[72] *Id.*

[73] *Id.* (internal quotation marks omitted).

[74] *Id.*

[75] The facts strongly suggest that Minniti was terminated for reasons other than Crystal's financial condition and his performance. Notably: (1) Minniti was terminated just one week after he refused Shashlo's directive to fire two employees; (2) he was only on the job for approximately nine months into what Crystal's leadership team understood to be a years-long effort to make the Plant profitable; (3) for at least two of those months Minniti was furloughed and therefore unable to have any impact on the Plant's functioning or profitability; (4) the Plant's profits were significantly impacted by COVID-19, a global pandemic for which no plant manager would reasonably have accounted or overcome; and (5) the only reason provided for Minniti's termination was the financial impact of COVID-19 and the need to ensure Crystal's financial stability, yet a managerial position was filled and significant raises were given within days of Minniti's firing, and a new plant manager was hired only three months later. Collectively, this evidence casts significant doubt upon Crystal's proffered reasons for firing Minniti. Although it is possible that Minniti was fired for legitimate reasons such as a personality conflict with Shashlo—who appears from Minniti's deposition testimony to be a difficult manager with poor interpersonal skills—Crystal provides no reasonable explanation

record makes clear that Minniti did not engage in any protected activity—a critical component of a *prima facie* case. Minniti argues only that he engaged in protected activity when he refused on June 16, 2020 to fire two African American employees who were absent from work that day and who had called in with medical excuses.[76]

As the United States Court of Appeals for the Third Circuit has stated, "protected 'opposition' activity includes not only an employee's filing of formal charges of discrimination against an employer but also informal protests of discriminatory employment practices, including making complaints to management."[77] Minniti's statements to Shashlo or human resources—no matter how informally made—are sufficient to constitute activity for purposes of Title VII, the PHRA, and § 1981. Nevertheless, for that activity to be protected, the employee must communicate to his "employer a belief that the employer has engaged in a form of employment discrimination."[78]

Minniti's statements to Crystal fail to meet that standard. The evidence to which the parties cite demonstrates that the activity on June 16 consisted of Minniti refusing to fire the Employees.[79] This occurred when Shashlo demanded the firing

---

for Minniti's termination. Nevertheless, Minniti has failed to marshal sufficient evidence in support of his retaliation claims, and Crystal's failure is therefore of no moment.

[76] Doc. 30-1 at 8-10.

[77] *Daniels*, 776 F.3d at 193.

[78] *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (ellipsis and internal quotation marks omitted). *See also Daniels*, 776 F.3d at 193 ("The complaint must allege that the opposition was to discrimination based on a protected category, such as age or race").

[79] Doc. 28-3 at 25-27.

of the two Employees who were absent, even after a human resources representative stated that the Employees had excused absences from work.[80] Minniti then explained to Shashlo "that these were the only two African-American employees that we had and it wasn't going to work. It was going to look bad" and potentially subject Crystal to litigation.[81] Shashlo reportedly "didn't care."[82]

This cannot reasonably be interpreted as having opposed unlawful racial discrimination. As the Third Circuit has observed, "[i]f litigants claim to be retaliated against for having opposed discrimination, they must have stood in opposition to it—not just objectively reported its existence or attempted to serve as an intermediary."[83]

Minniti did not even do that. He did not report discrimination; he merely stated that it would "look bad" to fire two African American employees, not that it would be discriminatory to so do, or that he felt the request was animated by discriminatory animus. To that end, Minniti points to no evidence that Shashlo wanted the employees fired due to their race, that he felt Shashlo's request was animated by discrimination, or that Minniti made any statement to Shashlo or human resources that Shashlo wanted the employees fired due to their race.

---

[80] *Id.* at 26.
[81] *Id.*
[82] *Id.*
[83] *Moore v. City of Philadelphia*, 461 F.3d 331, 350 (3d Cir. 2006).

In short, simply reporting that it would look bad to fire two African American employees and that such action could invite litigation falls far short of clearly communicating to Crystal "a belief that the employer has engaged in a form of employment discrimination."[84] Rather, such communications are too equivocal to constitute protected activity.[85]

Furthermore, even if Minniti's report were sufficiently unequivocal to constitute protected activity, the law is clear that "although a plaintiff in a retaliation case need not prove the merits of the underlying discrimination complaint, she must have acted under a good faith, reasonable belief that a violation existed."[86] "This standard requires an objectively reasonable belief that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute."[87] Accordingly, "where 'no reasonable person could have believed that' the underlying incident complained about 'violated Title VII's standard' for unlawful discrimination,"[88] the plaintiff engaged in no protected activity.

---

[84] *Crawford*, 555 U.S. at 276.

[85] *Cf. Moore*, 461 F.3d at 350 (concluding that "merely reporting the existence of racial problems" and acting as a "middle man" informing management that some individuals felt there were racial problems does not qualify as protected activity since such conduct is too "equivocal" to constitute opposition to discrimination). The same analysis applies to Minniti's meeting with Crystal's human resources representative Cardillo, as Minniti did not inform her that he felt the request to fire the employees was the result of racial discrimination. *See* Doc. 28-3 at 26-27.

[86] *Daniels*, 776 F.3d at 193 (brackets and internal quotation marks omitted).

[87] *Id.* at 194-94 (internal quotation marks omitted).

[88] *Moore*, 461 F.3d at 341 (quoting *Clark County v. Breeden,* 532 U.S. 268, 271 (2001) (brackets omitted).

Based upon the evidence to which Minniti cites, no reasonable person could have believed that his actions were in opposition to racial discrimination, or even that he subjectively believed he was opposing racial discrimination. Again, Minniti made no comments that he felt Shashlo's request to fire the employees was animated—in whole or in part—by racial discrimination. Nor, for that matter, does Minniti point to any evidence that Shashlo even knew the Employees were African American until after he requested their firing, and Minniti then explained that fact to Shashlo.[89] Minniti points to no comparators indicating that white employees were absent under similar circumstances without Shashlo asking for their termination.

Shashlo's directive was certainly rash and problematic given that Crystal policies permit employees to provide medical documentation for an absence after they return to work.[90] And in fact, the Employees later provided medical documentation to support their absences and were not ultimately fired.[91] However, it is undisputed that employee attendance at the Plant was a problem, and employees were routinely fired for absenteeism.[92] It is not unthinkable that Shashlo would request the termination of employees who did not report for their scheduled shifts. Given these facts, the Court simply cannot conclude that Minniti held an objectively

---

[89] *See* Doc. 28-3 at 26 ("[Shashlo] wanted them fired . . . I wouldn't fire them . . . I also explained to Andy that these were the only two African-American employees that we had and it wasn't going to work. It was going to look bad. And he didn't care").

[90] Doc. 27 ¶ 102.

[91] *Id.* ¶ 110.

[92] *Id.* ¶¶ 100-01.

reasonable belief that Shashlo engaged in racially discriminatory conduct when he requested that the Employees be fired. Minniti has therefore failed to establish that he engaged in protected conduct. Because Minniti has failed to establish a *prima facie* case of retaliation under Title VII, the PHRA, or § 1981, Crystal is entitled to summary judgment as to those counts.

### 2.   FMLA Claim

Finally, the Court turns to Minniti's claim that he was fired in retaliation for permitting the Employees to exercise their rights under the FMLA. Crystal argues that Minniti's claim fails because no one invoked an FMLA right.[93] Minniti has not responded to this argument in any way.[94] As an initial matter, "by omitting any reference to [the FMLA claim] in [Minniti's] opposition to Defendants' motion for summary judgment," he is deemed to have abandoned that claim.[95] And even if he had not, Crystal would still be entitled to summary judgment in its favor.

The FMLA prohibits "an employer from 'discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights.'"[96] To succeed on an FMLA retaliation claim where, as here, there is no direct evidence of retaliation, the burden falls on the plaintiff to establish a *prima*

---

[93]  Doc. 29 at 24-26.

[94]  *See* Doc. 30.

[95]  *McCarthy v. Int'l Ass'n of Machinists & Aerospace Workers*, No. 21-1673, 2021 WL 5766569, at *2 n.3 (3d Cir. Dec. 6, 2021).

[96]  *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014) (quoting 29 C.F.R. § 825.220(c)).

*facie* claim of retaliation by demonstrating "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."[97]

There is no evidence in the record that either Minniti or the Employees ever invoked FMLA leave, or were even discouraged from requesting FMLA leave. To the contrary, Minniti acknowledges that neither of the employees requested FMLA leave.[98] Because Minniti did not invoked FMLA leave, nor did he act on behalf of anyone who invoked or attempted to invoke FMLA leave, he cannot establish a *prima facie* case of FMLA retaliation, and Crystal is entitled to summary judgment in its favor as to this claim.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant Crystal's motion for summary judgment.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[97] *Id.*
[98] Doc. 27 ¶ 111.